UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ROSA H. G.C., | : | |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | No. 3:20-cv-1253 (SDV) |
| | : | |
| KILOLO KIJAKAZI, [1] | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| *Defendant*. | : | |

**RULING ON PENDING MOTIONS**

Plaintiff Rosa H. G.C. (hereafter "plaintiff") filed this administrative appeal pursuant to

42 U.S.C. § 405(g) from the decision of the Social Security Administration denying her

application for Title XVI supplemental security income benefits (hereinafter, "SSI").[2]  Pending

before the Court are plaintiff's motion for an order reversing the Commissioner's decision, and

defendant's cross-motion for an order affirming the decision.  For the reasons that follow, the

---

[1] Since the filing of this case, Kilolo Kijakazi became the Acting Commissioner of the Social Security Administration Commissioner of the Social Security Administration.  She is therefore automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

[2] Under the Social Security Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]."  42 U.S.C. § 1383(c)(1)(A).  The Commissioner's authority to make such findings and decisions is delegated to an administrative law judge ("ALJ").  *See* 20 C.F.R. § 416.1429.  A claimant may request review of an ALJ's decision by the Appeals Council.  *See* 20 C.F.R. § 416.1467.  If the Appeals Council declines review or affirms the ALJ opinion, the claimant may appeal to the United States District Court.  42 U.S.C § 405(g).  On appeal, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  *Id.*

Court **DENIES** plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 22);

and **GRANTS** defendant's Motion to Affirm the Decision of the Commissioner (Doc. No. 24).

## I.    LEGAL STANDARD

Under the Social Security Act, the term "disability" is defined as the "inability to engage

in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death, or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A claimant

will meet this definition if his or her impairments are of such severity that the claimant cannot

perform previous work and also cannot, "engage in any other kind of substantial gainful work

which exists in the national economy," considering the claimant's age, education, and work

experience.  42 U.S.C. § 423(d)(2)(A).

The Commissioner must follow the five-step sequential evaluation process for assessing

disability claims as provided in 20 C.F.R. § 404.1520.  (1) The Commissioner considers whether

the claimant is currently engaged in substantial gainful activity.  (2) If not, the Commissioner

considers whether the claimant has a medically determinable impairment or combination of

impairments that are "severe," meaning that it "significantly limits" the claimant's physical or

mental ability to do basic work activities.  (3) If the claimant has a severe impairment or

combination of impairments, the Commissioner evaluates whether, based solely on the medical

evidence, the claimant has an impairment which "meets or equals" an impairment listed in

Appendix 1, Subpart P, No. 4 of the regulations (the "Listings").  If so, and if it meets the

durational requirements,[3]  the Commissioner will consider the claimant disabled, without

---

[3] Unless the impairment is expected to result in death, it must have lasted or must be expected to
last for a continuous period of at least 12 months.  20 C.F.R. § 404.1509.

considering vocational factors such as age, education, and work experience.  (4) If not, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has the residual functional capacity (hereinafter "RFC") to perform his or her past work.[4]  (5) If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work in the national economy which the claimant can perform in light of his or her RFC, age, education, and work experience.  *See* 20 C.F.R. § 404.1520.  The claimant bears the burden of proof on the first four steps, while the Commissioner bears the burden of proof on the final step.  *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function."  *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981).  "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error."  *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted).  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  It must be "more than a mere scintilla or touch of proof here and there in the record."  *Id.*  If the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position.  *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d

---

[4] Residual functional capacity (hereinafter, "RFC") is the most a claimant can do in a work setting despite his or her limitations.  20 C.F.R. § 404.1545(a)(1).

Cir. 1982).  However, the Court does not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case."  *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).  "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision."  *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## II.  PROCEDURAL HISTORY

On May 21, 2015, plaintiff filed an application for SSI alleging a disability onset date of March 14, 2014.  R. 92.  The claim was denied initially on August 10, 2015 and at the reconsideration level on March 10, 2016.  R. 159, 166-170.  Plaintiff then filed a written request for a hearing, which was conducted by Administrative Law Judge Ryan Alger (hereinafter, "the ALJ") on November 2, 2017.  R. 65-83, 171-173.  The ALJ issued a decision on November 17, 2017 (hereinafter, the "prior decision") finding that plaintiff was not disabled under § 1614(a)(3)(A) of the Social Security Act.  R. 129-146.  On January 7, 2019, upon review, the agency's Appeals Council vacated the prior decision, and remanded to the ALJ with instructions to address certain deficiencies.  R. 153-54.

The ALJ conducted a second hearing on May 16, 2019 (hereinafter, the "2019 hearing").  R. 42.  The ALJ issued a new decision on June 27, 2019, finding that plaintiff was not disabled under the Social Security Act.  R. 15-34.  On August 6, 2020, the Appeals Council denied plaintiff's request for review.  R. 1-8.  Plaintiff appealed to this Court on August 26, 2020.  Doc. No. 1.

III.   **PLAINTIFF'S STATEMENTS**

In her June 5, 2015 application interview, plaintiff complained of high blood pressure, chronic migraines, back problems, panic attacks, pain in her joints and the body, and that her hands get swollen.  R. 408.  At the 2017 hearing, plaintiff's counsel summarized her conditions as: mental health, depression, PTSD with some panic, fibromyalgia, and a back condition with sciatica.  R. 69-70.  At the 2019 hearing, plaintiff's counsel summarized her conditions as: fibromyalgia, a chest wall pain attributable to the left shoulder, back pain with sciatica, depression and PTSD.  R. 47.

Plaintiff testified as follows at the 2017 hearing, through a Spanish-language interpreter. She was 44 years old on the hearing date.  R. 70.  Her highest level of education is third grade. R. 70.  She does not write sentences well; she switches the letters.  R. 72.  She moved from Puerto Rico to Connecticut in 2002, and has not been employed since moving to the state.  R. 71. She lives alone, does not drive, and takes a taxi to medical appointments.  R. 71-72.  She prepares basic food for herself.  R. 72.  She uses a laundromat for laundry, or her children help her.  R. 72.  Her children shop for groceries, and she goes with them sometimes.  R. 72.

Regarding mental health, plaintiff described panic attacks "once in a while" with anxiety and feeling desperate.  R. 77.  There is nothing in particular that causes her to panic, "sometimes [the panic attacks] happen just because."  R. 77.  Bouts of depression render her unable to get out of bed.  R. 78.  This occurs less than once a week.  R. 78.  She stays in bed for two to three days at a time without washing, getting dressed, or even picking up her children's phone calls.  R. 78. She does not speak with anyone besides her family on occasion.  R. 78.  She does not trust anyone.  R. 78.  She does not like to have friends.  79.

Regarding her physical health, plaintiff described difficulty walking due to pain, and can walk for about ten minutes at a time. R. 73. Her back pain affects the middle of her back, her hips and her legs. R. 74. The back pain affects her right leg. R. 74. She also has pain in her hands, neck and feet. R. 73. She can only sit for ten minutes due to a herniated disc. 75. Her medications make her sleepy. R. 74. She gets headaches three of four days a week that last all day. R. 75-76. She takes medication for the headaches, which helps some days, and not on others. R. 76.

Plaintiff offered additional testimony at the 2019 hearing, again through a Spanish-language interpreter. Plaintiff was 45 years old on the hearing date. R. 47. Plaintiff is financially supported by her children and the State. R. 48. She lives alone and is unable to drive, and takes a Medicaid taxi to medical appointments. R. 49. She rarely completes household chores such as cooking or doing her laundry. R. 49, 52. She is frequently tired, and often sleeps twice a day for around three or four hours. R. 51. Her whole body hurts. R. 49. She takes gabapentin for pain, which does not help much. R. 50. She feels anxious and desperate in stores and cars. R. 51-52. She suffers from panic attacks that "make [her] cry" and "make [her] want to get out of where [she is]." R. 52. Plaintiff is extremely forgetful. R. 49. She has left the stove on multiple times after cooking. R. 50. She has a pinched nerve, and her back pain goes into her right leg. R. 53. She cried "the whole entire week" before the hearing, and her daughter took her to the emergency room. R. 52.

The record also includes 982 pages of medical history, including treatment records for physical and mental health and a neuropsychological evaluation. R. 488-1469.

## IV.   __THE 2019 ALJ DECISION__

In the June 27, 2019, decision, the ALJ followed the sequential evaluation process to determine whether plaintiff was disabled under the Social Security Act. At Step 1, the ALJ found plaintiff did not engage in substantial gainful activity since May 21, 2015, the application date. R. 23.  At Step 2, the ALJ found plaintiff has the following severe impairments: joint dysfunction, degenerative disc disease of the cervical spine, degenerative disc disease of the lumbar spine, fibromyalgia, depression, anxiety, and post-traumatic stress disorder.  The ALJ also considered plaintiff's headaches and determined they were not a severe impairment. R. 23-24.  At Step 3, the ALJ found plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  R. 24.  Next, the ALJ determined plaintiff retains the following RFC:

> [T]o perform light work as defined in 20 CFR 416.967(b) except the claimant can carry out and remember simple instructions in an environment with few changes. The claimant can only have occasional interaction with coworkers and no interaction with the general public.

R. 26.

At Step 4, the ALJ found plaintiff has no past relevant work.  R. 26-33.  Finally, at Step 5, the ALJ relied on the testimony of the Vocational Expert (hereinafter, "VE") to conclude that there are jobs existing in significant numbers in the national economy that plaintiff can perform. R. 33-34.  Specifically, the VE testified that a person with plaintiff's vocational factors and the assessed RFC can perform the positions of retail marker, laundry attendant, and parts cleaner, of which there were approximately 120,000 jobs, 125,000 jobs and 110,000 jobs respectively in the national economy.  R. 34.  Accordingly, the ALJ determined plaintiff "has not been under a

disability, as defined in the Social Security Act, since May 21, 2015, the date the application was filed[.]"  R. 34.

## V.     **DISCUSSION**

Plaintiff raises seven grounds for appeal, which fall into two categories.  First, plaintiff contends that the ALJ committed legal error by failing to comply with the directives of the Appeals Council in its January 7, 2019 remand order to: (i) further evaluate headaches, PTSD, and fibromyalgia; (ii) evaluate fibromyalgia under Social Security Ruling ("SSR") 12-2p; and (iii) evaluate whether plaintiff's impairments meet or medically equal the severity of one of the listed impairments, and obtain medical expert evidence on this question if necessary.  Doc. No. 22-1, at 3, 12, 14.  Second, plaintiff contends that substantial evidence was lacking for the ALJ's RFC determination, resulting in error at Steps 4 and 5, because the ALJ (i) failed to find that borderline intellectual functioning was a medically determinable impairment; (ii) failed to find that headaches were a severe impairment; (iii) ignored or cherry-picked medical evidence; (iv) erred in weighing the various opinions of treating professionals; and (v) substituted his judgment for that of medical providers.  Doc. No. 22-1, at 1, 8, 12, 17, 23.  The Court addresses each in turn.

### a.   **The ALJ Complied with the Appeals Council's Directives**

An ALJ's failure to comply with remand instructions of the Appeals Council is legal error, *see* 20 C.F.R. § 416.1477(b) ("The administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order."), and may warrant remand to the agency for further proceedings.  *See e.g.*, *Casanova v. Saul*, No. 3:19-CV-886 (TOF), 2020 WL 4731352, at *4 (D. Conn. Aug. 14, 2020) (remand for failure to comply with AC's directive to obtain medical expert

opinion); *Ellis v. Colvin*, 29 F. Supp. 3d 288, 299 (W.D.N.Y. 2014) (same); *Cabibi v. Colvin*, 50 F. Supp. 3d 213, 231 (E.D.N.Y. 2014) (remanding for ALJ's failure to comply with AC's directive to obtain treatment records from particular provider and amplify analysis of provider's opinions).  In the present case, ALJ's compliance with the Appeal's Council's remand directives was adequate and did not constitute legal error.

### i.   <u>Further evaluation of headaches, PTSD, and fibromyalgia</u>

In its remand order, the Appeals Council noted that the ALJ's prior decision "did not evaluate whether the claimant's PTSD, fibromyalgia, and migraine headaches were severe medically determinable impairments" and instructed that "further evaluation as to whether these impairments are severe medically determinable impairments at step two . . . is required."  R. 153-54.  In the ensuing decision, the ALJ found fibromyalgia and PTSD to be severe impairments at Step 2, thereby satisfying that portion of the remand directive.  R. 23.  As for headaches, the ALJ devoted a paragraph to consideration of headaches at Step 2, with citations to relevant medical records, and concluded that headaches did not rise to the level of a severe impairment.  R. 24.  Although Plaintiff contends that this conclusion was not supported by the record, that is a question of fact, not legal error.

### ii.   <u>Evaluation of fibromyalgia under SSR 12-2p</u>

The Appeals Council also faulted the ALJ's prior decision for failing to consider whether fibromyalgia was a medically determinable impairment, and expressly directed the ALJ to "evaluate fibromyalgia under Social Security Ruling 12-2p."  R. 154.  Although the ALJ's decision on remand does not expressly refer to SSR 12-2p, the decision did include the requisite substantive analysis.  SSR 12-2p provides guidance on how to evaluate fibromyalgia in disability claims.  Soc. Sec. Ruling 12-2p, 2012 WL 3104869 (S.S.A. July 25, 2012).  The guidance

primarily focuses on criteria for determining whether a claimant has a medically determinable impairment of fibromyalgia.  *Id; see also Maldonado v. Berryhill*, No. 16-cv-165 (JLC), 2017 WL 946329, at *22 (S.D.N.Y. Mar. 10, 2017).  The balance of SSR 12-2p explains the familiar five-step sequence for determining whether an adult with a medically determinable impairment is disabled, with some specific considerations relating to fibromyalgia.  *Id.*

In compliance with the remand order, the ALJ's 2019 decision changed course and concluded at Step 2 that fibromyalgia was a "severe" medically determinable impairment.  R. 23. Although the ALJ's decision did not articulate how he applied the SSR 12-2p to reach that conclusion, the Court does not construe plaintiff to be seeking reversal on the basis of this omission, given that this particular conclusion was favorable to her.

The ALJ also specifically evaluated fibromyalgia as part of his RFC determination for purposes of Steps 4 and 5.  R. 26-28.  In the RFC context, SSR 12-2p specifically advises the ALJ to "consider a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have 'bad days and good days.'"  SSR 12-2p, at *6.  Here, the ALJ's RFC discussion addressed plaintiff's "history of fibromyalgia, accompanied by complaints of diffuse and generalized pain as well as specific pain complaints[.]"  R. 26.  The ALJ evaluated this history with citations to the medical record, including treatment specifically for fibromyalgia between 2014 and 2018, and reviewed imaging studies to determine whether the objective findings from those studies were consistent with plaintiff's subjective complaints.  R. 26-29.  The ALJ also addressed plaintiff's limitations related to depression and anxiety (R. 29), which SSR 12-2p notes may be "co-occurring conditions" with fibromyalgia.  SSR 12-2p, at *3. Although plaintiff objects to the ALJ's interpretation of the evidentiary record, again that is a question of fact, not legal error.

### iii.  **The ALJ's Step 3 analysis**

The remand order from the Appeals Council also noted that, in the ALJ's prior decision,

he failed to apply the current version of "the medical criteria for evaluating mental disorders"

and also "did not evaluate whether the claimant met or medically equaled Listing 12.15 for

trauma- and stressor-related disorders."  R. 153.  The Appeals Council directed the ALJ to

evaluate plaintiff's mental impairments at Step 3 with "specific findings and appropriate

rationale for each of the [four] functional areas described in 20 CFR 416.920a(c)," and to

determine whether the claimant meets or medically equals "the revised mental listings."  R. 154.

In addition, regarding all impairments, the Appeals Council instructed the ALJ to obtain medical

expert evidence on the Step 3 analysis "if necessary."  *Id.*

The ALJ did not obtain a medical expert opinion on whether plaintiff's impairments met

or medically equaled a Listing.  However, the Appeals Council provided the ALJ with discretion

to determine whether this was "necessary."  R. 154.  In light of the ALJ's compliance with the

remand order, including his consideration of relevant listings,[5] his analysis of each of the four

functional areas described in 20 C.F.R. § 416.920a(c),[6] and his application of the criteria of

paragraphs B and C of the mental listings,[7] it was within the ALJ's discretion to determine that a

---

[5]  Consistent with the severe impairments that the ALJ identified at Step 2, his Step 3 analysis
focused on Listings 1.02 (joints), 1.04 (spine), 12.04 (intellectual disorder), 12.06 (anxiety and
obsessive-compulsive disorders), and 12.15 (trauma- and stressor-related disorders).  As plaintiff
concedes, fibromyalgia is not a listed impairment in and of itself.  *See* SSR 12-2p, at *6.

[6] 20 C.F.R. § 416.920a(c)(3) identifies "four broad functional areas in which we will rate the
degree of your functional limitation: Understand, remember, or apply information; interact with
others; concentrate, persist, or maintain pace; and adapt or manage oneself."

[7] To satisfy the requirements of listings 12.04 (intellectual disorder), 12.06 (anxiety and
obsessive-compulsive disorders), or 12.15 (trauma- and stressor-related disorders), a claimant
must meet the criteria of paragraph A and either paragraph B or C, which are identical for those
Listings.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, part A2, §§ 12.04, 12.06, and 12.15.

medical expert opinion was not necessary, and the Court is not persuaded that this was legal

error.  *See* R. 24-26.  Moreover, the crux of plaintiff's objection is factual, not legal.  Plaintiff

disagrees with the ALJ's conclusion that the evidence did not satisfy the paragraph C criteria.

*See* Doc. No. 22-1, at 14 ("All of the 'paragraph C' criteria were endorsed in the medical opinion

of 9-26-17.").  That is a question of fact, not legal error.  Nor does the Court agree with

plaintiff's characterization of the ALJ's paragraph C determination as "conclusory," insofar as it

expressly addressed the four functional areas of 20 C.F.R. § 416.920a(c) and the criteria of

relevant listings, with supporting citations to the medical record.  R. 24-25.

In light of the foregoing, the ALJ complied with the remand directives of the Appeals

Counsel, and there is no legal error.

### b.  Substantial evidence supports the residual functional capacity determination

Turning to issues of fact, plaintiff contends that substantial evidence was lacking for the

ALJ's RFC determination, resulting in error at Steps 4 and 5.  "RFC is an assessment of an

individual's ability to do sustained work-related physical and mental activities in a work setting

on a regular and continuing basis."  Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *1 (S.S.A. July

2, 1996); *see also* 20 C.F.R. § 416.945(a) ("Your residual functional capacity is the most you can

---

To satisfy the paragraph B criteria, a claimant must "show extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: 1. Understand, remember or apply information; 2. Interact with others; 3. Concentrate, persist, or maintain pace; 4. Adapt or manage oneself."  *Id.*

To satisfy the paragraph C criteria, a claimant must show medical documentation of the disorder for a period of at least two years, and evidence of both (a) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the] mental disorder" and "*marginal adjustment*, that is, [ ] minimal capacity to adapt to changes in [ ] environment or to demands that are not already part of [the claimant's] daily life."  *Id.* (emphasis added).

still do despite your limitations.").  It is determined "based on all of the relevant medical and other evidence."  *Id.*

The court must affirm an ALJ's RFC determination when it is supported by substantial evidence in the record. *See Barry v. Colvin*, 606 F. App'x 621, 622 n.1 (citing 42 U.S.C. § 405 (g)) (summary order).  The question is not whether the ALJ's decision expressly discussed every iota of relevant evidence.  *See Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When . . . the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that [the ALJ] have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.").  Rather, the question is whether there is evidence in the record that would compel a reasonable factfinder to reach a different conclusion on an issue of fact.  *See Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) ("The substantial evidence standard means that once an ALJ finds facts, we can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'").

In this case, plaintiff contends that the ALJ misconstrued the evidence in the record by (i) failing to find that borderline intellectual functioning was a medically determinable impairment; (ii) failing to find that headaches were a severe impairment; (iii) ignoring or cherry-picking medical evidence; (iv) making judgments on medical issues contrary to the judgment of treating providers; and (v) assigning incorrect weight to the various opinions of treating professionals. The Court addresses each in turn, and concludes that there is substantial evidence to support the ALJ's RFC determination.

### i.   Whether borderline intellectual functioning is a medically determinable impairment

Plaintiff contends that the ALJ should have found a medically determinable impairment of borderline intellectual functioning based on a March 6, 2019, evaluation by clinical neuropsychologist Sarah E. Bullard, Ph.D.  (R. 1427-30.)  Notably, plaintiff did not allege an intellectual or cognitive impairment affecting her ability to work during the agency proceedings, which included two separate hearings.  Nonetheless, the ALJ discussed in depth the longitudinal evidence concerning plaintiff's cognitive abilities, both in medical records and plaintiff's self-reporting, including with respect to memory, attention, concentration, processing, and ability to care for herself.  R. 24-25, 27, 29-32.  In the course of that discussion, the ALJ gave ample consideration to Dr. Bullard's evaluation.  R. 25, 27, 29, 32.

There is substantial evidence to support the ALJ's conclusion that plaintiff did not have a medically determinable intellectual or cognitive impairment at Step 2, and the ALJ also appropriately considered related evidence in the context of the mental health listings at Step 3 and in the RFC determination.  In fact, that approach is entirely consistent with Dr. Bullard's opinion.  During her examination of plaintiff, Dr. Bullard observed that plaintiff was "alert," that she was "fully oriented," that plaintiff's attention was "adequate to engage in sustained meaningful conversation," and that plaintiff's "speech was fluent without word finding difficulties."  R. 1428.  Dr. Bullard also noted that plaintiff's "autobiographical memory appeared intact," that "no motor abnormalities were observed," and that plaintiff's thought process was "linear, logical and goal oriented."  R. 1429.  In her evaluation, Dr. Bullard briefly noted that plaintiff tested in the borderline impaired range in general knowledge skills (not intellectual capacity), which Dr. Bullard attributed to plaintiff's third grade education and vocational history.  R. 1429.  Importantly, she added that "there does not appear to be any

evidence of a decline in intellectual functioning."  *Id.*  In addition to evaluating plaintiff's knowledge skills, Dr. Bullard closely examined plaintiff's cognitive functioning and opined that plaintiff exhibited intact learning and memory skills but impaired processing speed, which "suggested she will require more time than her peers to complete paper and pencil type tasks." *Id.*  Dr. Bullard administered a number of tests and opined that "neurocognitive tests results were remarkable for intact functioning in the majority of areas assessed, with the exception of relative weaknesses in frontal/executive functions and processing speed."  R. 1430.  Ultimately, Dr. Bullard concluded that "although cognitive weaknesses would be expected to interfere with her functioning on a daily basis, they in and of themselves do not preclude her ability to work," and opined that plaintiff's emotional functioning – which she diagnosed as major depression and PTSD – was her greatest challenge to holding a job, though Dr. Bullard admitted that she had not been provided any mental health treatment records to review.  R. 1420, 1430.  Similar to Dr. Bullard's opinion, the ALJ approached the intellectual and cognitive issues as complications that, while not severe medical impairments in and of themselves, informed plaintiff's mental health functioning and her RFC, but ultimately did not render the plaintiff unable to work.  Substantial evidence supports this approach and the ALJ's related conclusions, particularly where plaintiff's own descriptions of her mental health limitations were not supported by the documented medical evidence during the course of treatment, which the ALJ reviewed.  R. 27, 29.

> ## ii.   <u>Whether headaches were a severe impairment</u>

As noted above, the ALJ complied with the Appeals Council's instruction to consider whether headaches were a severe impairment at Step 2.  R. 24.  Plaintiff contends that the ALJ incorrectly concluded that headaches were not a severe impairment.  Doc. No. 22-1, at 13. Plaintiff takes particular issue with the ALJ's characterization that plaintiff reported "only vague

symptoms"; however, the ALJ's use of the word "vague" is explained in the same sentence, in which he notes plaintiff's reports "that her headaches occurred in multiple places, were of varying degrees and lasted for days," citing primary care records from June to August 2015.  R. 24, 573-599.  The ALJ also noted that plaintiff reported increased headaches in 2016 and had been prescribed medication, and reported increased intensity of headaches in August 2018, citing outpatient clinic records from November 2015 to March 2017 and hospital records from August 2017 to March 2019.  R. 24, 725-817, 1196-1265.  Plaintiff also criticizes the ALJ's characterization of her headache complaints as "intermittent" and cites pages of the medical records where she reported headaches.  Doc. No. 22-1, at 13.  However, the ALJ referenced many of the same records, and plaintiff's additional citations are cumulative.  *See Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("we do not require that [the ALJ] have mentioned every item of testimony presented to him . . .").

Plaintiff's objections on this score are more semantic than substantive.  The question is whether the headaches would have "more than a minimal effect" on plaintiff's ability to perform basic work activities.  *See* Soc. Sec. Ruling 85-28, 1985 WL 56856 (S.S.A. 1985).  Here, the totality of the plaintiff's medical record reveals relatively little treatment for headaches, demonstrates infrequent complaints relative to other conditions for which plaintiff sought treatment and, as the ALJ noted, does not indicate any abnormal neurological findings to which headaches could be traced.  R. 24.  In short, substantial evidence supports the ALJ's findings that the headaches were not "severe" as to preclude an inability to work and plaintiff has pointed to no evidence that would compel a reasonable factfinder to conclude otherwise.

### iii. **Whether the ALJ cherry-picked evidence**

Plaintiff also asserts that the ALJ cherry-picked evidence.  An ALJ may not "cherry-pick" evidence by "improperly crediting evidence that supports findings while ignoring conflicting evidence from the same source." *Rodriguez v. Colvin*, No. 3:13-cv-1195 (DFM), 2016 WL 3023972, at *2 (D. Conn. May 25, 2016); *see also Smith v. Bowen*, 687 F. Supp. 902, 904 (S.D.N.Y. 1988) ("Although the ALJ is not required to reconcile every ambiguity and inconsistency of medical testimony, he cannot pick and choose evidence that supports a particular conclusion.")  In particular, plaintiff contends that the ALJ: adopted portions of Dr. Bullard's evaluation but not others; focused on positive activities of daily living ("ADLs") but not negative; misinterpreted description of plaintiff's fibromyalgia as "stable" to mean not functionally limiting; and incorrectly stated that plaintiff has pursued "only intermittent rheumatological evaluation and treatment during the relevant period."  Doc. No. 22-1, at 2-5, 8-12.  While the Court agrees that the ALJ made one mistake of fact as to the frequency of plaintiff's fibromyalgia treatment, this was a harmless error, and there remains substantial evidence to support the ALJ's RFC determination.

Regarding the opinion of neuropsychologist Dr. Bullard (R. 1427-30), the ALJ's reliance on only portions of the evaluation was reasonable.  Dr. Bullard described depression and PTSD that left plaintiff with low self-esteem, little hope for change, and observed that plaintiff "has closed herself in and is simply allowing life to pass her by."  R. 1430.  While Dr. Bullard suggested that such "psychiatric dysfunction" might be a "functional impediment," Dr. Bullard did not clearly connect the dots between that observation and her conclusion that plaintiff cannot "hold down even a part-time job at the present time," and she did not explain what specific work activities the plaintiff specifically would be unable to perform.  *Id.*  It was not error for the ALJ

to credit Dr. Bullard's medical judgments based upon the results of the neuropsychological tests that Dr. Bullard administered but to place less reliance on her "opinion as to the claimant's ability to perform basic work activities" due to Dr. Bullard's "lack of specificity" on that point and because Dr. Bullard concededly had not reviewed any of plaintiff's mental health treatment records. R. 32, 1427. *See* 20 C.F.R. § 416.927(d) (statement by medical source that claimant is "unable to work" is not a "medical opinion," and this determination is reserved to the Commissioner).

Likewise, the ALJ's assessment of activities of daily living is supported by the record. R. 29-30, 32. The ALJ did not limit this discussion to plaintiff's handwritten activities of daily living submitted in June 2015 (R. 414-22) – which were four years old when the ALJ issued his decision in June 2019 – but, rather, primarily cited to plaintiff's reports to mental health professionals over the years, with additional citation to her testimony at the May 2019 hearing. R. 29-30, 32. A review of the totality of plaintiff's mental health treatment records indicates, per plaintiff's contemporaneous reports, that she experiences good days at times and bad days at other times, often depending on her concerns and stress over familial conflicts and financial stability. R. 637-655, 1295-1414. The ALJ's evaluation is consistent with the tenor of plaintiff's treatment records. R. 29-30, 32. Although plaintiff notes (*see* Doc. No. 22-1, at 11) that certain of her more dire self-assessments did not appear in the ALJ's summary, the record as a whole supports the ALJ's conclusions as to the credibility of plaintiff's various statements.

As for plaintiff's objection to the ALJ's quoting from medical records indicating that she was "stable" in February 2016 (R. 737-741) and had "no acute complaints" in January 2018 (R. 1215), this again is semantic. Plaintiff accuses the ALJ of mistaking "stable" for "non-severe" (*see* Doc. No. 22-1, at 4), but that is not the case. The ALJ expressly stated at Step 2 that

fibromyalgia was a "severe" impairment. R. 23. He also clarified that by "stable" he meant "her pain has persisted and remained unchanged for several years." R. 29. This observation is consistent with plaintiff's report at a treatment visit in January 2018 that "her pain has been unchanged for the past several years" and that "[s]he has no acute complaints at this time" (R. 1215), and the ALJ did not misinterpret the record in this regard. While crediting the persistence of plaintiff's pain and acceptance of the diagnosis that she has fibromyalgia, the ALJ had to make a reasonable conclusion as to the degree of functional limitation. Here, there was ample evidence that clinical findings simply did not comport with the level of pain and limitation described by plaintiff. For example, a medical note from a June 3, 2015, consultation for joint pain notes that "imaging studies did not reveal any significant arthritis" and that plaintiff "does not have any inflammatory arthropathy." R. 507. A December 4, 2015, radiology report indicates that an imaging study of plaintiff's right hip showed "bones intact, joint spaces maintained" and concluded "unremarkable right hip." R. 513. The same report reveals "unremarkable pelvic radiograph" and "mild lumbar spondylosis and discogenic degenerative change." *Id.* While plaintiff complained of ongoing left shoulder pain, an MRI showed "no evidence of any full thickness tear" and was "unremarkable for any issues that will require acute surgical intervention." R. 781, 786-787. While she also complained of long-standing neck pain, a December 2015 medical note states that an MRI of plaintiff's cervical spine showed some degenerative changes "without significant stenosis or nerve compression" and which was characterized as "mild wear and tear in her neck." R. 914-916. On August 4, 2017, an imaging study of plaintiff's cervical spine indicated "normal alignment of cervical spine," "minimal spurring off C5 and C6" and "[t]here are no significant degenerative changes." R. 930. In short, there was substantial evidence in the record to support the ALJ's finding that "the claimant's

mild clinical findings, conservative treatment history and lack of follow through with treatment recommendations suggest that her pain is not as limiting as alleged." *Id.*

Plaintiff is correct in one respect: the ALJ made a factual error in the fibromyalgia discussion as to the frequency of treatment. The ALJ stated that "[t]here is little evidence of ongoing rheumatological monitoring" between 2016 and 2018, and that plaintiff's most recent treatment was in February 2018. R. 28. However, the records demonstrate that plaintiff pursued regular treatment with rheumatologist Santhanam Lakshminarayanan, M.D. every six months from December 2014 through February 2019. R. 508, 562, 920, 922, 930, 1168, 1184. This was harmless error. After addressing fibromyalgia treatment, the ALJ continued with a lengthy discussion of plaintiff's "persistent" pain, her ongoing treatment, related clinical findings, and her activities of daily living. Even adding the fact that plaintiff regularly attended rheumatology treatment every six months, there remains substantial evidence to support the ALJ's conclusion as to the functional limitations of plaintiff's combination of impairments including fibromyalgia. *See*, *e.g.*, *Schlichting v. Astrue*, 11 F. Supp. 3d 190, 207 (N.D.N.Y. 2012) ("The overall decision to discount Plaintiff's allegations is supported by substantial evidence even excluding consideration of the level of treatment.").

In summary, plaintiff's contentions that the ALJ cherry-picked evidence are unavailing, and there is substantial evidence to support the ALJ's RFC determination.

> ### iv.  <u>Whether the ALJ erred in weighing the various opinions of treating professionals</u>

Plaintiff also contends that the ALJ erred in assigning partial weight to Dr. Bullard's neuropsychological evaluation (R. 1427), little weight to LCSW Nieves-Garcia's two undated opinions circa early 2015 (R. 493, 590), great weight to LCSW Nieves-Garcia's July 2015 opinion (R. 516), and little weight to the September 2017 and the April 2019 opinions of LPC

Burgos-Jimenez (R. 1115, 1416).  Because this claim was filed prior to March 27, 2017, the rules

in 20 C.F.R. § 416.927 and Social Security Ruling 06-03p applied to the ALJ's evaluation of the

opinion evidence.[8]  *See Krissy Mae Jean J. v. Comm'r of Soc. Sec.*, No. 2:18-cv-00051, 2020

WL 3638233, at *5 (D. Vt. July 6, 2020).  Pursuant to SSR 06-03p, as distinguished from

"acceptable medical sources," social workers and counselors are "other sources" that cannot

establish the existence of a medically determinable impairment but "may provide insight into the

severity of the impairment(s) and how it affects the individual's ability to function."  *See* Soc.

Sec. Ruling 06-03p, 2006 WL 2329939 (S.S.A. Aug. 9, 2006).  "[T]he adjudicator generally

should explain the weight given to opinions from these 'other sources,' or otherwise ensure that

the discussion of the evidence in the determination or decision allows a claimant or subsequent

reviewer to follow the adjudicator's reasoning."  *Id.*, at *6.  The ALJ did so here.  Noting that

these opinions were based on plaintiff's subjective reporting rather than clinical findings, the

ALJ proceeded to compare and contrast them to other subjective evidence in the record –

including plaintiff's self-reporting in treatment notes from February 2015 through March 2019,

the providers' observations of plaintiff during treatment interactions, and plaintiff's own

statements during the agency proceedings – and to the objective neurocognitive testing

performed by neuropsychologist Dr. Bullard.  R. 30-33.  These were appropriate factors to

consider.  *See* SSR 06-03p, at *4-5 (factors for considering opinion evidence from "other

sources" include length and frequency of relationship; consistency with other evidence; degree to

which evidence is presented to support opinion; quality of explanation; whether source has

---

[8] For claims filed on or after March 27, 2017, the rules in 20 C.F.R. § 416.920c would apply.
*See* 20 C.F.R. §§ 416.920c, 416.927.  Correspondingly, Social Security Ruling 06-03p has been
rescinded "for claims filed on or after March 27, 2017."  *See* Rescission of Soc. Sec. Rulings 96-
2p, 96-5p, and 06-03p, Fed. Reg. 82, 15,263 (Mar. 27, 2017).

relevant specialty; and any other factors that tend to support or refute the opinion).  The ALJ's discussion is consistent with the record and there is substantial evidence to support the ALJ's findings on the weight of the Nieves-Garcia and Burgos-Jimenez opinions.

It was likewise reasonable for the ALJ to give more weight to specialist and neuropsychologist Dr. Bullard's clinical findings on plaintiff's cognitive challenges, which the ALJ noted were based on "commonly accepted testing measures and appear to be consistent with the claimant's overall reported abilities."  R. 32.  *See* SSR 06-03p factors.  As for the ALJ's choice to credit Dr. Bullard's well-explained medical opinions but accord less weight to her unexplained opinions on work activities, that was reasonable as discussed above.

### v. <u>Whether the ALJ substituted his judgment for that of medical providers</u>

Lastly, plaintiff contends that the ALJ substituted his judgment for that of medical providers and accuses the ALJ of "playing doctor."  *See* Doc. No. 22-1, at 2-3, 11.  For all the reasons discussed above, the accusation is unfounded.  The ALJ conducted a detailed analysis of, and appropriately weighed, the evidence in the entire record.  Even if another reviewer might reach a different conclusion, "[t]he substantial evidence standard means that once an [ALJ] finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*."  *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis retained; internal quotation marks omitted).  That is not the case here.

**VI.**     **CONCLUSION**

For the reasons set forth above, plaintiff's Motion to Reverse the Decision of the

Commissioner (Doc. No. 22) is **DENIED**, and defendant's Motion to Affirm the Decision of the

Commissioner (Doc. No. 24) is **GRANTED**.

This is not a recommended ruling.  The consent of the parties allows this magistrate judge

to direct the entry of a judgment of the District Court in accordance with the Federal Rules of

Civil Procedure.  Appeals can be made directly to the appropriate United States Court of Appeals

from this judgment.  *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

SO ORDERED, this 30th day of March, 2022, at Bridgeport, Connecticut.

                                                        */s/ S. Dave Vatti*
                                                        S. DAVE VATTI
                                                        United States Magistrate Judge